UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ENIO RIVERA and MICHAEL TALTON,

        Plaintiffs,

   v.

ROCHESTER GENESEE REGIONAL
TRANSPORTATION AUTHORITY,

        Defendant.
_____

**ATTORNEY AFFIRMATION IN SUPPORT OF MOTION TO CONSOLIDATE AND SEVER ACTIONS**

Civ. No. 07-cv-06483L

**SCOTT D. PIPER** affirms and says:

    1.    I am an attorney with the law firm of Harris Beach PLLC, the attorneys of record for the Defendant, Rochester Genesee Regional Transportation Authority ("RGRTA" or the "Authority"), in the above-captioned action (hereinafter, "Rivera-Talton") and another action, Michael Talton v. Rochester Genesee Regional Transportation Authority, Civ. No. 12-cv-06616, both filed in the Western District of New York. I offer this Affirmation in support of RGRTA's Motion pursuant to Rule 42 of the Federal Rules of Civil Procedure, to (1) consolidate Plaintiff Michael Talton's two actions before this Court; and (2) separate Plaintiff Talton's action(s) from that of his co-Plaintiff Enio Rivera in the instant matter.

    2.    I offer this Affirmation on the basis of my knowledge of both actions as counsel of record for the Authority.

**OVERVIEW OF THE ACTIONS**

*The Instant Action: <u>Rivera/Talton</u>*

3. As previously noted, the instant Motion pertains to two actions. <u>Rivera-Talton</u>—the instant case—originated with a lawsuit filed on or about October 3, 2007, by Plaintiffs Talton and Rivera against the Authority and two individuals, John Tiberio (hereinafter "Tiberio"; at the time of the first action a Maintenance Director at the Authority's wholly-owned subsidiary, Lift Line, Inc. or "Lift Line"), and Dominic Folino ("Folino"; a mechanic at Lift Line). A copy of the original Complaint in this action is annexed hereto as **Exhibit A.**

4. An Amended Complaint was filed on May 2, 2008, after the then-Defendants' Motion to Dismiss resulted in the dismissal of Folino from the case. The Amended Complaint stated causes of action by Plaintiff Talton for race-based harassment and retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"); the New York State Human Rights Law ("HRL"), N.Y. EXEC. LAW §290 *et seq*.; Section 1981 of the Civil Rights Act of 1866 ("§1981"); and interference and retaliation under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §2601 *et seq*., against the Authority, and against Tiberio[1] as applicable.

5. It also stated causes of action by Plaintiff Rivera for harassment based on ethnicity or national origin and for retaliation under the same statutes, also brought against the Authority and against Tiberio as applicable. A copy of the Amended Complaint filed in the instant action is annexed hereto as **Exhibit B**.

---

[1] Tiberio is no longer a Defendant in <u>Rivera-Talton</u>. As is recounted below, a Second Circuit Court of Appeals decision issued February 10, 2014, amending an earlier decision remanding the <u>Rivera-Talton</u> matter to the District Court, removed Tiberio from the action, primarily on the bases that he had not been named as a Defendant-Appellee at the time the action was first appealed to the Second Circuit; and because he had not been served as a party to the appeal.

*Procedural Background and the Plaintiffs' Claims*

6.     The discovery period in the instant matter was extended on a number of occasions, more than once in response to the Plaintiffs' production of non-party witness affidavits that required additional depositions on the part of the Defendants. Consequently, the deadline for the close of factual discovery moved from December 11, 2008 (pursuant to a July 9, 2008 Scheduling Order) to February 11, 2009; to May 13, 2009; to July 13, 2009 (this last extension for the limited purpose of deposing non-party witness and affiant Leroy Hardy). On June 15, 2009, shortly after the last deadline was set, another non-party witness affidavit (that of Colleen Thomas; hereinafter the "Thomas Affidavit") was produced by the Plaintiffs, causing the Defendants to file a Motion to preclude the Thomas Affidavit or, in the alternative, extend the deadline for discovery yet again.

7.     The final deadline set for the completion of factual discovery was November 6, 2009—an extension granted for the limited purposes of deposing Ms. Thomas and one other non-party affiant, and providing the Plaintiffs the opportunity to conduct the deposition of then-Director of Labor Relations for the Authority Dan Howland.

8.     The Plaintiffs never deposed Mr. Howland and, indeed, despite a fact discovery period that lasted close to a year and a half, never conducted any other depositions or performed any discovery by way of interrogatories, inspections, document demands, or any other discovery device.

9.     The Defendants' discovery efforts—including the service of written interrogatories, demands for documents, and the depositions of the Plaintiffs together with seven non-party witnesses—yielded a record of the Plaintiffs' claims that showed a series of factual and legal disparities; sufficient that, when the Defendants moved for summary judgment on all claims in January 2010, they found it necessary to first request permission to submit a memorandum of law of forty pages, instead of the twenty-five typically allotted.

10. This request was premised on the Defendants' assessment that the individual Plaintiff's claims were so varied in fact and law that the legal arguments surrounding them could effectively be combined only in small part. A copy of the Defendants' request to the Court for an extension of the page limit for its memorandum of law, dated January 7, 2010 and granted on January 12, is annexed hereto as **Exhibit C**.

11. These significant variances between the Plaintiffs' claims were to some extent an outgrowth of the fact that the Plaintiffs' working circumstances bore little resemblance to one another except for the fact that they were employed by the same entity. As the Defendants' Statement of Material Facts, submitted in support of their Motion for Summary Judgment showed, Plaintiff Rivera was (and is) a bus driver for Lift Line, while Plaintiff Talton was a fueler-washer (responsible for, as the title implies, fueling and washing Lift Line buses between bus "runs," or uses). Plaintiff Rivera had worked at Lift Line for approximately a decade by the time Plaintiff Talton was hired; and the two men were hired by, and reported to, different people. (Plaintiff's Talton's immediate supervisor was Tiberio, an individual who had no supervisory authority over Plaintiff Rivera.) Indeed, some of Plaintiff Rivera's claims of harassment even predated Plaintiff Talton's *hire* by Tiberio.

12. The Plaintiffs' working conditions were also disparate from one another. The two of them did not work alongside one another—Plaintiff Rivera spent most of his day away from the Lift Line facility driving a bus, while Plaintiff Talton spent most of his day alone in and around a bus "barn" (essentially, a bus garage), washing and fueling up buses. Plaintiff Talton's shift varied during the course of his employment, so that the two did not consistently share the same working hours.

4

13. Moreover, the nature of the allegations giving rise to the Plaintiffs' claims reveal that those claims emanate from very different origins. Plaintiff Rivera's claims of *ethnic* and/or national origin discrimination (allegedly premised on his Puerto Rican ethnicity) coalesced in large part around confrontations between himself and Dominic Folino, with whom Plaintiff Rivera had an extensive personal history stemming from the fact that Plaintiff Rivera's wife left him for Mr. Folino, and eventually married Folino. The record characterized Folino and Rivera as friends until this episode, after which Plaintiff Rivera embarked on a campaign of written complaint letters to Lift Line and Authority management concerning, primarily, Folino's conduct. Nowhere in that string of letters did Plaintiff Rivera align his situation with that of Plaintiff Talton.

14. Plaintiff Rivera's ethnic-harassment claims also resulted from alleged confrontations with Folino's fellow mechanics and other Lift Line employees who Plaintiff Rivera identified as a "clique" (consisting of non-managerial personnel), including an African-American mechanic named Pat Barrett and a Caucasian mechanic named John Stiggins. While Plaintiff Rivera submitted that some of the alleged harassment he suffered came in the form of a few ethnic slurs (and potential slurs) from Folino (i.e., several uses of the words "spic" and/or "Taco Bell" between approximate 2003 and the time of his deposition in 2009), the majority of Plaintiff Rivera's allegations depict the "harassment" as incidents in which he was provoked by smirks, hostile glares, rude gestures, invitations to fight, and horseplay (sometimes involving near-collisions in vehicles) at the hands of Folino's alleged "clique."

15. Tiberio, who was not Plaintiff Rivera's supervisor, merits little mention in the context of Plaintiff Rivera's complaints, outside of a handful of isolated incidents in which he was associated with the behavior of one or more members of Folino's supposed "clique."

16. Plaintiff Talton's claims of *racial* harassment revolved to a *much* greater extent around overt expressions of racism, such as his contention that various individuals used the terms "nigger," "monkey," and "boy" in his presence or employed what he termed "faux ghetto slang." (One of these allegations involved Folino's alleged use of the word "nigger," although Plaintiff Talton observed at deposition that Folino had not directed the word at him.) The most significant of these allegations revolve around the alleged use of the word "nigger" by Plaintiff Talton's supervisor, Tiberio; and the allegation that an unidentified person threw a brick at Plaintiff Talton and yelled "nigger" from a nearby woods while he was working behind the facility bus "barn" (although Plaintiff Talton never mentioned this incident to anyone until more than three years later, when he suddenly recalled it at deposition).

17. Plaintiff Talton's harassment and retaliation allegations also focus quite heavily upon the behavior of Tiberio and some other members of the Authority's management. Plaintiff Talton alleged that Tiberio repeatedly reprimanded him; assigned him tasks that he did not assign other fueler-washers (some of whom, notably, were also African-American); denied Plaintiff Talton the opportunity to take a lunch break at least once; "smirked" at Plaintiff Talton while directing him to wash one of the company vehicles; followed Plaintiff Talton around his work area to ensure that Plaintiff Talton was performing his assigned tasks; and drove around the Lift Line facility while giving Plaintiff Talton what Talton characterized as "evil looks."

*Subsequent Procedural Background*

18. Following the Defendants' Motion for Summary Judgment filed on January 15, 2010, the instant action was dismissed but appealed to the Second Circuit Court of Appeals. On December 21, 2012, the Circuit Court of Appeals reversed the grant of summary judgment with respect to some of the Plaintiffs' claims, affirming with regard to Plaintiff Talton's FMLA claims;

Plaintiff Rivera's retaliation claims; and Plaintiff Rivera's individual claims against Tiberio. (A copy of the Second Circuit Court of Appeals' initial decision, dated December 21, 2012, is annexed hereto as **Exhibit D**.) The Second Circuit subsequently rescinded its mandate and ordered factfinding on the question of whether Tiberio remained a proper defendant to the action following appeal, since Tiberio had never been named an appellee nor served in connection with the Plaintiffs' appeal. As is mentioned in Footnote 1 of this Affirmation, on February 10, 2014, the Second Circuit amended its prior decision to reflect the finding that Tiberio was no longer a defendant to the action. (Copies of the civil docket for Rivera-Talton, reflecting these proceedings, and of the Second Circuit's February 10, 2014 decision, explaining the circumstances surrounding Tiberio's release from the case, are annexed hereto as **Exhibits E and F**, respectively.)

19. In affirming the grant of summary judgment with respect to many of Plaintiff Rivera's claims, the Second Circuit Court of Appeals explained that Plaintiff Rivera had "produced insufficient evidence that Tiberio helped create a hostile work environment"; and that Plaintiff Rivera had shown no evidence that he had been retaliated against, in contrast to Plaintiff Talton who had produced evidence that Tiberio and other members of RGRTA management had threatened his job following the filing of charges of discrimination with the Equal Employment Opportunity Commission.

20. The Circuit Court of Appeals also commented in its decision that Plaintiff Rivera's harassment claims "barely" rose to above the legal threshold of a viable hostile environment claim, terming the remand of this claim "a close call."

21. The remanded claims (as amended by the Second Circuit's amended decision issued on February 10, 2014) are now awaiting pretrial proceedings before the Court. It is anticipated that prior to trial, the parties will attempt mediation—which was not mandated in the Western District of

New York at the time of the action's inception, and which consequently was never attempted during initial discovery proceedings.

*Plaintiff Talton's 2012 Action: <u>Talton v. RGRTA</u>*

22. While Rivera-Talton proceeded, Plaintiff Talton filed a separate action in the Western District of New York on or about November 15, 2012, alleging that he had been subjected to harassment on the basis of his race (again) and retaliatory discharge. The action followed after a series of similarly-framed charges of discrimination made to the New York State Division of Human Rights ("SDHR") and/or EEOC between 2009 and 2012, only the last of which were ever followed with a lawsuit. A copy of Plaintiff Talton's new Complaint, dated November 7, 2012, is annexed hereto as **Exhibit G**.

23. Plaintiff Talton's 2012 Complaint totaled 177 Paragraphs; 98 of them were devoted to recounting earlier episodes of alleged racial harassment, including the allegations of Plaintiff Talton's first Complaint (i.e., the instant action, <u>Rivera-Talton</u>) and were pleaded, according to the 2012 Complaint, because they were necessary "to demonstrate the context in which the [new] claims of discrimination pleaded herein arose."

24. The "new" allegations of Talton's 2012 Complaint reference one of the same actors Plaintiff Talton identified as associated with his previous action, including Dominic Folino, who Plaintiff Talton alleged had harassed him (ostensibly, on the basis of his race) in October 2011; and reflected the continuance of Plaintiff Talton's actions that he was singled out for negative treatment by Lift Line management (represented in the "new" allegations by Lift Line Director of Maintenance Scott Berger and then-Director of Labor Relations Dan Howland, following Tiberio's 2009 resignation) either as a form of racial harassment or in retaliation for his complaints of allegedly race-based harassment.

25. Plaintiff Talton's new action has been referred for mediation, which has been delayed by the withdrawal of Plaintiff Talton's counsel (Christina Agola, Esq.—also counsel of record for both Plaintiffs in Rivera-Talton) in November 2013 and Talton's relatively recent securing of new counsel (Melvin Bressler, Esq.).

26. A mediation encompassing *all* outstanding claims on the part of Plaintiff Talton would likely greatly facilitate resolution, because the mediated outcome would afford the Authority the certainty that there remained no further potential exposure to liability stemming from other cases: namely, the Rivera-Talton matter. In short, the ability of Talton and the Authority to reach final resolution is dependent to at least some extent on their ability to discuss all of Talton's claims in one sitting.

27. Prior to the withdrawal of his previous counsel, Plaintiff Talton did conduct discovery in his second action, seeking to depose, among others, the actors identified in the instant (Rivera-Talton) action who were never deposed in the original instance. Similarly, Plaintiff Talton's interrogatories seek discovery regarding events constituting the "context[ual]" background offered up in Paragraphs 13-111 of his 2012 Complaint.

28. The consolidation of Plaintiff Talton's actions, and the separate trial of Plaintiff Rivera's claims, are therefore highly logical from the standpoints of the avoidance of jury confusion and the conservation of the parties' resources. With the consolidation of Plaintiff Talton's actions, for example, the jury can assess his various race-harassment and retaliation claims in the context of the entirety of his employment.

29. With the separation of Talton's cases from Plaintiff Rivera's claims, the risk is eliminated that a jury will be confronted with a jumble of witnesses from different time periods— each giving testimony about actions directed at *one* of the Plaintiffs, but not the other—and forced to

try to keep the testimony of each such witness attributed to the proper Plaintiff and his corresponding claim.  Further—from the practical perspective of timing—if Rivera's case is severed from Talton's, he will not have to wait for the completion of mediation, discovery, and pretrial proceedings associated with Talton's second action, in order for his trial to go forward if Rivera wishes to dispense with mediation.

   30. Accordingly, RGRTA respectfully requests that this Court consolidate Talton's cases, and that it sever Rivera's case so that it may proceed independently.


Dated: June 6, 2014                       s/ Scott D. Piper
                              SCOTT D. PIPER